William A. Boyd v. Commissioner. Mark W. Allen v. Commissioner. *
Boyd v. Comm'r
Docket Nos. 4988, 4989.
United States Tax Court
1946 Tax Ct. Memo LEXIS 84; 5 T.C.M. (CCH) 791; T.C.M. (RIA) 46221; September 13, 1946
*84 Morse D. Campbell, Esq., 821 Ford Bldg., Detroit 26, Mich., and Edmund Darling, C.P.A., 815 Ford Bldg., Detroit 26, Mich., for the petitioners. Melvin S. Huffaker, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent has determined deficiencies in income tax for the years and in the amounts as follows: Docket
Petitioner
No.
Year
Deficiency
William H. Boyd
4988
1940
$20,750.11
1941
2,422.18
Mark W. Allen
4989
1940
24,609.53
1941
8,842.66
Petitioners *85 have conceded certain adjustments. Other adjustments have been resolved by stipulation. The questions remaining for decision are: (1) Whether the purported sale of almost all of the assets of a corporation to its shareholders in 1940 resulted in a taxable distribution to the shareholders. (2) If so, whether petitioners Boyd and Allen, alone, and not Allen's wife, constituted the corporate shareholders to whom such distribution was taxable. (3) Whether petitioner Allen's wife could be recognized for income tax purposes as being engaged in business in 1941 as a partner with petitioners Allen and Boyd. (4) Whether $7,619.76 of the "accounts receivable" acquired by the partnership from the corporation and collected in 1941 constituted income to the partnership in 1941. The proceedings were consolidated for hearing. Petitioners filed their returns with the collector for the district of Michigan. Findings of Fact The record consists of a stipulation of facts, which is incorporated herein by reference, oral testimony and exhibits. The Mark W. Allen and Company, hereinafter called the corporation, is a Michigan corporation which was organized in 1904 to engage principally *86 in the manufacture of soap, beauty and toilet preparations. The authorized capital stock of the corporation was 1,000 shares. Mark W. Allen, one of the petitioners herein, received 998 shares. His mother and father, as qualifying shareholders, each received one share. No certificates were actually issued for any of these 1,000 shares. The corporate existence was fixed at a 30-year term. In 1920, the corporation employed William A. Boyd, the other petitioner herein. Boyd was then about 30 years old; Allen, around 47. Boyd had been associated with several concerns engaged in the same type of business as that of the corporation. Allen wanted a capable and enterprising young man to help direct the business of the corporation. At the time of Boyd's employment, Allen agreed to sell Boyd a one-third interest in the corporation if the arrangement proved satisfactory. Allen and Boyd found their business association satisfactory. On July 14, 1921, Allen sold Boyd 333 shares in the corporation for $5,000. At that time Allen owned all the 1,000 outstanding shares. The corporation issued a certificate for the 333 shares to Boyd, and a certificate to Allen for 666 shares. A certificate for the *87 remaining one share was issued in the name of Allen's wife as a qualifying share. Boyd became the president, Mrs. Allen the vice-president, and Allen the secretary and treasurer of the corporation. They also became the sole directors. Boyd, Allen, and Mrs. Allen have continued to hold, and still hold, these same offices. In 1921, Allen's daughter, aged 12, was stricken with infantile paralysis. In April 1922, Allen's father died, leaving him an estate valued between $300,000 and $400,000. Allen discussed with Boyd the advisability of giving Mrs. Allen a substantial interest in the business so that she could take care of thedaughter in case anything else went wrong. On November 14, 1922, Allen executed at the office of the corporation a stock assignment form which recited that he assigned and transferred to Alice L. Allen, his wife, his 666 shares in the corporation. Boyd and two office employees signed the stock assignment forms as witnesses. Allen attached the assignment form to the stock certificate for the 666 shares with a removable clip. On the back of the certificate a space was provided for purposes of transferring the ownership of the shares. Allen and Boyd went to Allen's *88 house, where Allen gave the certificate and attached assignment to his wife. She in turn endorsed to Allen the certificate for the one share originally issued in her name by filling in the back of the certificate in the space provided therefor. Boyd signed as witness. Boyd then took the certificate for the one share back to the office of the corporation and deposited it in the company safe. Several months later Allen placed the certificate for the 666 shares and assignment attached thereto in his lock box in the company safe. It has since remained there. The safe was a combination safe. The combination was known to Allen and Boyd and possibly to their secretaries. The key to the lock box in the safe was kept among the general office keys. The ownership of the 666 shares of stock was never transferred on the books of the corporation from Allen's name into Mrs. Allen's name. The ownership of the one share of stock remained on the books of the corporation in Mrs. Allen's name and was never transferred into Allen's name. The corporation filed yearly corporate income tax returns. In the return for the year 1922, the year of the alleged assignment of the 666 shares, and for each *89 year up to and including 1935, Allen was designated as a compensated officer of the corporation owning 666 shares. In the returns filed for 1936 up to and including 1940, he was listed as owning only one share. The corporation's original existence of 30 years terminated in 1934. At a meeting of the shareholders held in 1934 to extend the corporate term, at which Mrs. Allen was not present, the minutes designated the shareholders of the corporation as Allen, owner of one share, Mrs. Allen, owner of 666 shares, and Boyd, owner of 333 shares. The minutes for all the other meetings merely noted that Allen, Mrs. Allen and Boyd were the shareholders of the corporation without designating the number of shares held by each. On May 25, 1934, articles of incorporation extending the term of the corporation were filed with the Michigan Secretary of State. In the articles, Mrs. Allen was listed as the owner of 666 shares and Allen as the owner of one share. In 1936 Boyd desired to purchase additional shares of the corporation to assure himself of majority control. On January 10, 1936, Boyd and Mrs. Allen executed a sales agreement which recited that Mrs. Allen agreed to sell Boyd 177 shares *90 of the corporation for the sum of $33,224.67. Boyd agreed to make periodic payments from his salary until he paid the full purchase price, at which time title to the stock was to be transferred to him. Boyd made the first payment on January 17, 1936. Thereafter he continued to make weekly and semimonthly payments. As of April 1, 1945, Boyd had paid all but $6,477.05 of the total purchase price. The payments were all made the same way. Boyd received a salary check from the business which he endorsed to the order of Mrs. Allen. Boyd then gave the check to Allen, who endorsed it under the designation of "attorney in fact for Alice L. Allen." Allen then deposited the check in his own personal bank account. Mrs. Allen never received the proceeds of the checks. Allen kept a book account of the payments received from Boyd for the stock which he listed as owing to Mrs. Allen. On December 31, 1944, as will be described in more detail hereinafter, Allen credited these amounts which he listed on his books as owing to Mrs. Allen to the payment of two promissory notes which she had given him in 1940. Allen handled all the details with respect to the sale of the 177 shares to Boyd. The corporation *91 never declared any cash dividends. On December 24, 1936, the Board of Directors declared a dividend of $6 per share, to be paid in promissory notes of the corporation payable five years thereafter. The corporation then issued two five year negotiable promissory notes, with interest at 7 percent. One note was payable to Allen in the amount of $4,002. The other was payable to Boyd in the amount of $1,998. The $4,002 note payable to Allen represented the $6 dividend on 667 shares. No note was issued payable to Mrs. Allen, although she was a shareholder of record of one share. On the same day, Allen delivered his own negotiable promissory note to Mrs. Allen for $3,996 without interest payable ten years thereafter. Because of the destruction of Mrs. Allen's income tax return for 1936 pursuant to Act of Congress, it is not known whether Mrs. Allen returned the $3,996 as dividend income for 1936. On December 30, 1939, the Board of Directors again declared a dividend in notes of the corporation. The dividend was $1 per share. One note was issued payable to Allen in the amount of $667. The other note was issued payable to Boyd in the amount of $333. No note was issued payable to Mrs. Allen. *92 The notes were payable on demand, with 6 percent interest. On the same day, Allen delivered to Mrs. Allen his own promissory note payable ten years thereafter for $666. In her income tax return for 1937, Mrs. Allen included the $666 as dividend income. However, the agreement signed by Mrs. Allen and Boyd for the sale to Boyd of 177 shares specified that dividends paid by the corporation on the 177 shares were to be shared by the parties in proportion to the amount of principal Boyd had paid in upon the stock. These two dividends issued in 1936 and 1939 were the only dividends ever declared on the stock of the corporation. Mrs. Allen never performed any work for the corporation. She never was paid a salary. She made no withdrawals from the corporation. She was completely unfamiliar with the business. With the exception of the two meetings held in 1936 and 1939 for the purpose of declaring dividends on the stock of the corporation, she attended no meetings of the corporate directors or shareholders. Until 1941, the corporation was always engaged in the manufacture and sale of soap, beauty and toilet preparations. In 1921 almost its entire business was devoted to compounding and *93 packaging various creams and cosmetics under contracts with its customers. The customers then sold the products under the customers' own labels and trade-names. Several hundred different items were so manufactured at that time. By 1940, the type of business done by the corporation had shifted from the almost exclusive preparation of products under contracts with customers. About one-half of the gross sales, labor, floor space and expenses were still devoted to this contract business. The other half consisted of the production and manufacture of shaving cream which was put out under the corporation's own trade-name and distributed through wholesale channels. The corporation was the youngest entrant into the business of manufacture of shaving cream. In 1940, the gross sales of the business were a little over $300,000. The corporation had approximately 600 customers. One of these customers accounted for about one-half of the corporation's total contract business. The corporation had between 85 to 95 employees in 1940. About 20 of these were salesmen or supervisory employees. The others were operating employees, consisting of 10 office help, 10 control chemists and male help, and *94 the balance were bottling and finishing girls. The type of business in which the corporation engaged was always very specialized and competitive. The raw materials, consisting of chemicals and containers, are available at rather uniform prices on the open market. The success of the business is dependent to the greatest extent upon the experienced knowledge, sales ability and contacts of the directing heads. The specialized knowledge consists of buying the proper ingredients, compounding them properly to meet the requirements of the buyer, packaging the product at a low price, and intimate familiarity with the trade. Above all, successful contacts with leading customers is essential. In the early years of the corporation, Allen was the directing head of the business. He supplied the necessary supervisory skill, knowledge of the trade and contracts with the important customers. After Boyd became president of the corporation, he gradually took over many of these functions. By 1940, Boyd was the more active of the two men. He supervised the manufacturing, packaging, and selling of the products. Allen concerned himself chiefly with the financial matters of the corporation, checking *95 on contracts, purchases, and prices. He still retained his consulting duties, and worked for the corporation about 7 to 8 hours daily. Allen received a salary of $7,010 from the corporation in 1922. His salary was gradually increased until, in the years 1937 through 1940, he received annual compensation of $18,250. Boyd originally received, and continued until 1936 to receive, one-half as much compensation as Allen. In 1936 Allen and Boyd both were paid $17,000. From 1937 up to and including 1940 Boyd, as well as Allen, received $18,250 per annum from the corporation. The average annual net income reported for income tax purposes by the corporation for the five-year period prior to 1941 was $5,021.40. The average tangible assets used in the business for this same five-year period were valued on the books of the corporation at approximately $93,000. In 1940, Allen and Boyd decided that it would be to their advantage to have the business in the form of a partnership, rather than in the form of a corporation. The corporation's salary and dividend policy had been subject to criticism. The corporation had difficulty in obtaining bank loans, and had to borrow the necessary funds *96 from Allen personally. It was thought that the change to the partnership form would facilitate bank loans. After the formation of the partnership, as will be described in more detail hereinafter, the partnership was actually able to borrow from the banks amounts which had been refused to the corporation. Allen and Boyd also believed that a partnership could comply more easily than the corporation with the zoning laws of Detroit. On December 21, 1940, Allen, Mrs. Allen, and Boyd signed a partnership agreement which recited that the parties agreed to engage in the business of manufacturing and selling chemical products commencing January 1, 1941. It was also provided in the agreement that the capital to be invested by the parties was to consist of all the assets, except land and buildings, of the Mark W. Allen and Company which the corporation was about to sell to the partnership. The partners' interests in the partnership were listed as one percent for Allen, 51 percent for Boyd and 48 percent for Mrs. Allen. The agreement provided further that the first $36,000 of profits were to be divided equally between Allen and Boyd and the balance divided among the three partners in accordance *97 with their respective interests. Losses were to be shared in exactly the same manner as profits. Withdrawals were to be allowed semi-monthly in amounts agreed upon by the parties. The parties were also to give such time and service to the business, and have authority to sign partnership checks, as would be mutually agreed upon. It was further agreed that in the event Allen died before Mrs. Allen, or Boyd died before Mrs. Boyd, the partnership was to pay each month for a period of three years to Mrs. Allen or Mrs. Boyd, a sum equal to one-third of the amount Allen or Boyd was allowed to withdraw from the partnership in the calendar month preceding his death. The amounts to be paid to Mrs. Boyd were to be charged to Boyd's capital account. If the capital interest of Boyd was sold by his estate prior to the three-year period, the payments were to terminate. The amounts to be paid to Mrs. Allen, in the event Allen predeceased her, were to be charged to her own, and not to Allen's, capital account. The agreement also provided that in the event any of the partners died, or desired to withdraw from the partnership, his interest in the partnership was first to be offered to the remaining *98 partners at a price to be mutually agreed upon. The remaining partners did not have to exercise the option to buy. If the remaining partners did desire to buy the deceased or withdrawing partner's interest, but could not agree with the seller on the price, they could assure a sale to themselves at a price reflecting the book value of the partnership's land and buildings, the cash value of any life insurance policies, and two and one-half times the value of the balance of the partnership assets less liabilities. Pursuant to the partnership agreement, Allen and Boyd each were authorized to withdraw semi-monthly from the partnership funds an amount not exceeding $750. The authority to sign partnership checks was also delegated to Allen and Boyd alone. On December 23, 1940, the corporation executed a bill of sale which recited that it sold to Boyd, Allen and Mrs. Allen, doing business as the Mark Allen Company, hereinafter referred to as the partnership, all of the corporation's assets, including patents, trademarks, and good will, except the corporation's real estate and land contracts. Boyd, Allen, Mrs. Allen, and the partnership agreed to assume the liabilities of the corporation *99 which were not related to the real estate retained by the corporation. As will be described in more detail hereinafter, Boyd, Allen, and Mrs. Allen undertook to pay book value for the assets which they received from the corporation and turned over to the partnership. At the time of the transfer, the value on the books of the corporation of all the assets transferred to the partnership was $170,845.20. No value was ascribed on the books to patents, trademarks, or good will. The partnership assumed liabilities in the amount of $37,620.21. The net book value of the assets received by the partnership was $133,224.99. After the transfer, the corporation retained land and buildings and prepaid insurance and taxes valued on the books at $80,020.59. The corporation also retained liabilities relating mainly to the land and buildings in the amount of $66,847.23. Immediately prior to the transfer, the corporation also had outstanding twelve notes payable to Boyd and Allen in the amount, including interest, of $46,566.86 for salaries and dividends covering the years 1936 through 1940. All but two of the notes were not payable by the corporation prior to 1940. The amount of accumulated *100 earnings or profits available for the payment of dividends within the meaning of the Internal Revenue Code was $91,941.35. Boyd, Allen and Mrs. Allen purported to pay for the $133,224.99 book value of net assets in accordance with their specified interests in the partnership. All the parties made payment by means of 20-year, non-interest bearing, notes. Allen gave the corporation his note in the face amount of $1,332.25 for his specified one percent interest in the partnership. Boyd's 51 percent interest amounted to $67,944.74. He gave the corporation his note for $51,884.38 and for the $16,060.36 balance, cancelled notes for that amount payable to him from the corporation for salary and dividends. Mrs. Allen's capital interest in the partnership was listed in the partnership agreement at 48 percent or $63,948. The corporation owed Allen $30,506.50 in the form of notes payable for salary and dividends. Mrs. Allen gave her 20-year note to the corporation in the face amount of $33,441.50. Allen cancelled the notes owing to him in the amount of $30,506.50, making the $63,948 due the corporation. Mrs. Allen then gave Allen two 20-year non-interest bearing notes in the respective amounts *101 of $25,237.20 and $5,269.30 in payment of the $30,506.50 of corporate notes cancelled by Allen. Boyd's records revealed that by December 30, 1944, he had paid $25,868.89 of the purchase price of the 177 shares of the corporation. Allen's records showed a credit balance owing to Mrs. Allen on that date of $30,280. On December 31, 1944, Allen credited this $30,280 on his books to the two notes payable to him from Mrs. Allen for $30,506.50, leaving a book balance of $224.50 which Mrs. Allen owed Allen. For the $133,224.99 book value of net assets transferred, the corporation received from Boyd, Allen and Mrs. Allen, 20-year non-interest bearing notes in the face amount of $86,658.13. The balance of $46,566.86 represented the salary and dividend indebtedness which was cancelled by Allen and Boyd. On January 31, 1941, and monthly thereafter, as will be described hereinafter, payments were made to the corporation on the Boyd, Allen and Mrs. Allen notes. During 1941, $5 a month was allocated on the corporate books to Allen's note, $240 a month to Mrs. Allen's note, and $255 a month to Boyd's note. By December 31, 1944, the unpaid balance on the original $86,658.13 indebtedness was $41,659.61. *102 The corporation has continued in active existence since the formation of the partnership on January 1, 1941. At that time the corporation leased to the partnership its land and buildings at a monthly rental of $500. During 1941 the corporation purchased additional land and built an addition to one of the buildings at a cost of about $16,000. The $16,000 was financed in part by a loan from Allen to the corporation. The corporation leased the additional land and building to the partnership commencing on January 1, 1946, at a monthly rental of $225. Thereafter, the total rent paid by the partnership to the corporation for all the land and buildings was $725 per month. The corporation reported in its income tax return for 1941 gross income of $6,465, consisting entirely of rents. No income tax was shown to be due because of the amount of interest, property taxes and depreciation deductions claimed. Since January 1, 1941, the partnership has carried on the manufacture of soap, beauty and toilet preparations in exactly the same manner as the corporation. The partnership has the same customers, employees, directing heads, and equipment. Capital investment accounts for Boyd, Allen, *103 and Mrs. Allen were entered on the books of the partnership. The initial net worth of the partnership was the book value of the net assets received from the corporation in the amount of $133,224.99. Allen's investment account was credited with a one percent interest, or $1,332.25. Mrs. Allen's account was credited with a 48 percent interest, or $63,948. Boyd's account reflected the remaining 51 percent, or $67,944.74. Withdrawal accounts were also set up on the books of the partnership for Boyd, Allen and Mrs. Allen. Boyd and Allen each were authorized to make semi-monthly withdrawals in the amount of $750. Allen withdrew $12,765.76 from the partnership in 1941. He gave Mrs. Allen $550 a month for household expenses. During 1941 partnership checks in the amount of $500 a month were issued to the corporation in payment of the Boyd, Allen, and Mrs. Allen 20-year notes. Five dollars of this $500 a month was charged to Allen's withdrawal account. Boyd withdrew $20,068.67 from the partnership in 1941. Of this, $255 a month represented payments on Boyd's note held by the corporation. Mrs. Allen personally made no withdrawals from the partnership during 1941. Her account, however, *104 was charged with $240 a month representing her alleged share of the $500 monthly payment by partnership check on the 20-year notes held by the corporation. In December 1941, an additional partnership check in the amount of $400 was issued to the corporation in payment of the notes. Mrs. Allen's capital account was therefore charged with a total of $3,072 for 1941, all of which was paid by the partnership to the corporation. The partnership profit and loss statement for 1941 revealed net earnings in the amount of $49,409.32. Of this amount, $18,000 was first allocated to Boyd and $18,000 to Allen. The remaining $13,409.32 was divided on the books among Boyd, Allen and Mrs. Allen in accordance with their specified interests in the partnership as adjusted by the unpaid balance remaining on Boyd's purchase of the 177 shares of the corporation. At the end of 1941, the capital investment account of Boyd was in the amount of $71,543.74. Allen's account was for $6,700.58 and Mrs. Allen's for $68,483.56. Mrs. Allen never performed any services for the partnership. She never contributed to the partnership's management or control. She never made any withdrawals from the partnership other *105 than the amounts allocated on the partnership books as payment to the corporation for her 20-year note. Allen paid all the living expenses in connection with the home. Mrs. Allen never contributed any money toward household or other living expenses. Immediately prior to the transfer of the assets to the partnership, the books of the corporation reflected accounts receivable in a face amount of $71,401.65. The books also reflected a provision for losses in the amount of $7,619.76, or a net value of $63,781.89 for the accounts receivable. In valuing the net assets transferred to the partnership at $133,224.99, accounts receivable were valued at the net amount of $63,781.89. The partnership acquired the accounts receivable in the first instance for $63,781.89. During 1941, the face value of $71,401.65 was collected by the partnership on the accounts receivable. The partnership return of income for 1941 revealed net income in the amount of $50,551.39. By letter dated February 25, 1944, the Bureau of Internal Revenue proposed an adjustment to reflect $7,619.76 of income realized by the partnership on the collection of the accounts receivable at the face value of $71,401.65 as against *106 the acquisition cost of $63,781.89. As of December 31, 1944, the partnership adjusted its accounts with the corporation to take care of this $7,619.76 by adding to the unpaid balance on the 20-year notes payable to the corporation by Boyd, Allen and Mrs. Allen, the separate sums of $3,886.08, $76.20 and $3,657.48, respectively. No new notes, however, were issued. Allen did not intend to, nor did he make, a valid gift of 666 shares of the corporation to Mrs. Allen. At all times material to the issues here in controversy, Allen was the owner of all the shares of the corporation other than those purchased by Boyd. Mrs. Allen contributed to the partnership no capital originating with her. She performed no services for the partnership and contributed nothing to its management and control. Opinion The facts in this consolidated proceeding are long and complicated. They all seem to have a bearing on more than one of the several questions involved. Nevertheless, the legal issues are fairly well defined. Prior to 1941, the Mark W. Allen & Company was a corporation engaged in the manufacture of soap, beauty and toilet preparations. Boyd, Allen and Mrs. Allen were the shareholders *107 of record. On December 21, 1940, Boyd, Allen and Mrs. Allen entered into an agreement which recited that they were about to engage in business as a partnership. Our findings reveal that the actual shareholders of the corporation were Boyd and Allen alone, and that Mrs. Allen could not be recognized for tax purposes as a bona fide member of the partnership. Our initial use of the terms "shareholders" and "partnership" must therefore be understood to refer merely to the nominal members of these groups. On December 23, 1940, the corporation transferred to its shareholders, doing business as a partnership, all of its assets except the corporate real estate and land contracts. The transfer took the form of a sale of corporate assets in exchange for promissory notes of the shareholders and cancellation of corporate indebtedness. Thereafter the partnership carried on the manufacture of the soap, beauty and toilet preparations in exactly the same manner as the corporation. The corporation leased to the partnership, at a monthly rental, the land and buildings which the corporation had retained. In 1941 the corporation purchased other land and built an addition to its buildings, which it also *108 leased at a monthly rental to the partnership. The business of the corporation has been restricted to these real estate activities. The corporation has not been dissolved. Commencing January 31, 1941, the shareholders have made monthly payments to the corporation on their promissory notes. By December 31, 1944, more than one-half of the original indebtedness had been paid. This case does not involve any issue under section 45 of the Internal Revenue Code. Respondent does not question the independent existence of the corporation and partnership for tax purposes. He rightfully has not sought to include the profits of the partnership in the gross income of the corporation even though the interests of the shareholders in the corporation may have been the same as their interests in the partnership. Seminole Flavor Co., 4 T.C. 1215. Respondent likewise does not assert that the transfer of the corporate assets to the partnership constituted a taxable distribution in liquidation to the shareholders under section 115 (c) of the Internal Revenue Code. See *109 Cook v. United States, 3 Fed. Supp. 47; France Co. v. Commissioner, 88 Fed. (2d) 917. The corporation has not been dissolved. The shareholders have not turned in their stock. The corporation is engaged in a legitimate business activity. For the assets transferred, as will be subsequently developed, the shareholders cancelled corporate indebtedness and turned over to the corporation valuable promissory notes. Over one-half of the face amount of the notes has already been paid. Under such circumstances, the transfer of the assets by the corporation to the shareholders for a valuable consideration did not constitute a taxable liquidating distribution to the shareholders under section 115 (c), and respondent does not contend otherwise. C. M. Menzies, Inc., 34 B.T.A. 163. What respondent does claim, however, is that the corporation turned over to its shareholders more than it received from them. He asserts that this difference in value constituted a taxable dividend to the shareholders under sections 22 (a) and 115 (a). At the time of the transfer the corporation had accumulated earnings or profits available for the payment of dividends within the *110 meaning of the Internal Revenue Code in the amount of $91,941.35. In his brief, respondent explains his position as follows: The corporation had built up a considerable surplus in the operation of its business and although the sales agreement transferred patents, trademarks, good will, business and everything of value, in addition to the book assets, the value of the property transferred to the stockholders, tangible and intangible, had value far in excess of the consideration received by the corporation and of a value of at least $91,941.35. It is most apparent that the intangible assets transferred, including the good will of the business, were highly important factors to be taken into consideration and comprised a large part of the value to be attributed to the value of the business and assets of the corporation as a going concern. Yet the stockholders paid nothing therefor. * * *
In view of the fact that the transfer by the corporation to its stockholders included intangibles which were transferred without consideration, it becomes apparent that an amount equal at least to the value of the intangibles was in any event distributed to the stockholders in excess of any consideration *111 paid for the transfer of all assets involved. Since the earnings and profits of the corporation were equal to the intangible value, there was a distribution of earnings and profits taxable to the stockholders as a dividend under the provisions of Sec. 19.22(a)-1 of Regulations 103. [1]
A sale of corporate assets to stockholders, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend. *112 Palmer v. Commissioner, 302 U.S. 63; Timberlake v. Commissioner, 132 Fed. (2d) 259, 261; affirming 46 B.T.A. 1082. Accordingly, it is well settled that where the sale is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders, the difference between the purchase price and the fair market value of the property received by the stockholders is taxable as a dividend to the stockholders within the meaning of section 115 (a). J. E. Timberlake, supra; Palmer v. Commissioner, supra; Elizabeth Susan Strake Trust, 1 T.C. 1131; V. U. Young, 5 T.C. 1251; American Liberty Oil Co., 43 B.T.A. 76; affirmed 127 Fed. (2d) 262. As is evident from the portion of respondent's brief quoted above, respondent has centered his attack mainly upon the fair market value of the assets which Mark W. Allen & Company transferred to its shareholders. These assets had a book value of $170,845.20. The shareholders assumed corporate liabilities in the amount of $37,620.21. The net book value of the assets received by the shareholders was $133,224.99. The shareholders purported *113 to pay this amount for the assets. Respondent has not challenged the use of book values. He does not claim that the fair market value of the corporation's tangible assets, consisting of machinery, equipment, merchandise, supplies, raw materials, etc., was in excess of the value ascribed to them on the books of the corporation. Book value is competent, though not conclusive, evidence of value, and we likewise are satisfied of its probative force here. Wessel v. United States, 49 Fed. (2d) 137. Respondent's chief contention is that the shareholders paid nothing for certain valuable intangible corporate assets which were transferred to them. It is true that the bill of sale between the corporation and the shareholders speaks of patents, trademarks, and good will. No value was ascribed to any of these on the books of the corporation. However, there is nothing in the record which suggests that they had any sale value. In fact, the evidence points just the other way. Prior to the transfer, about one-half of the total business done by the corporation consisted of the preparation of various creams and cosmetics for customers who put out the products on the market under *114 their own labels and trade names. The raw materials used in the preparation of these products are available at rather uniform prices on the open market. The success of this type of contract business is dependent to the greatest extent upon the specialized knowledge and contacts of the directing heads. Allen and Boyd were the directing heads of the corporation. From 1922 on, they supplied the necessary knowledge of buying and compounding the proper ingredients, together with an intimate familiarity with the trade. Above all, they supplied the necessary contacts with the leading customers. These customers would follow them personally, and not the corporate name. The success of this part of the corporate business was thus dependent solely on the personal skill, ability and other characteristics of Boyd and Allen. Under these circumstances, no value attributable to good will was transferred by the corporation to the shareholders. D. K. MacDonald, 3 T.C. 720; Howard B. Lawton, 6 T.C. 1093; Floyd D. Akers, 6 T.C. 693. The other half of the corporation's business consisted of the manufacture of shaving cream which was put out under the corporation's *115 own trade name and distributed through wholesale channels. Although the value of this trade name and type of good will would not seem to automatically follow Boyd and Allen as individuals, it is clear from the record that no value can be attributed to these intangibles on the transfer. The corporation was the youngest entrant into the business of manufacture of shaving cream. The average annual earnings of the corporation for the five-year period prior to 1941 was $5,021.40. During this same period the average tangible assets used in the business were valued on the books at approximately $93,000 per annum. Even though a conservative return of only 8 percent is allowed on this $93,000 of tangible assets, (ARM 34, 2 Cum. Bull. 31) it is clear that there were no surplus earnings which could be attributable to the value of any intangible assets. Our use of this formula as a permissible method in fixing the value of intangible assets has recently been approved in Ushco Mfg. Co. v. Commissioner, 151 Fed. (2d) 821. We are satisfied, therefore, that the fair market value of all the corporate property received by the shareholders, less the liabilities assumed, *116 did not exceed the book value sum of $133,224.99. We now come to the value of the property which the shareholders turned over to the corporation in exchange for the corporate assets. Boyd and Allen were the owners of twelve notes of the corporation in the amount, including interest, of $46,566.86. The notes had been issued for salaries and dividends covering the years 1936 through 1940. All but two of the notes were not payable by the corporation prior to 1940. In part payment of the assets received from the corporation, Boyd and Allen cancelled this $46,566.86 of corporate indebtedness. Respondent has not raised any question relating to the cancellation of these notes. Obviously, if prior to the transfer, the notes already had been includible as income by Boyd and Allen, a transfer of corporate assets in payment of the notes would not result in any additional income to Boyd and Allen. For example, Boyd and Allen received dividends from the corporation in 1936 in the form of notes payable five years after date of issue. Let us assume that they reported the face amount of the notes as dividend income for 1936. When in some later year the corporation pays off the notes in cash, or *117 in property having the same value as the face amount of the notes, Boyd and Allen would not derive any income from the actual payment of the notes. To them payment would be, as the shareholders claim was the situation here, merely the exchange of the notes for cash or property valued at no more than the cost basis of the notes. On the other hand, if in the instant case the $46,566.86 of notes had never been includible as income by Boyd and Allen, both of whom were on the cash basis, their compensation and dividend income would have been postponed until 1940 when the notes were paid by the transfer of the corporate property. As an illustration of this, let us assume that in 1937 the corporation issued to Boyd and Allen as compensation for services notes payable two years thereafter. Let us assume further that the notes were not income to Boyd and Allen for 1937. If the corporation pays off the notes in 1939, by cash or other property, Boyd and Allen derive taxable income in 1939. Since respondent has not questioned this aspect of the transaction, the record is not clear whether the $46,566.86 of corporate notes cancelled by Boyd and Allen upon the receipt of the corporate property *118 in 1940 had otherwise been includible in their gross income. In all probability many of the notes had. For example, Allen reported $22,020 as compensation received from the corporation in 1940. His regular salary was $18,250. One of the notes involved represents salary for 1939 in the amount of $3,770. This note was issued to Allen in March, 1940. These amounts of $3,770 and $18,250 may constitute the $22,020 reported for 1940. However, we do not think this matter should be left to speculation. The parties may be able to agree under the Rule 50 computation as to whether these notes had otherwise been includible in the gross income of Boyd and Allen. If they had, their cancellation constituted adequate consideration for $46,566.86 of the corporate assets received and resulted in no income to the shareholders in 1940. To the extent the notes had not otherwise been includible in the gross income of Boyd and Allen, income was realized in 1940 on the receipt of the corporate assets. If the parties can not agree on the relevant facts, additional evidence will have to be presented at a further hearing. Net assets of $133,224.99 were transferred to the shareholders. As described above, *119 Boyd and Allen cancelled corporate notes owing to them in the amount of $46,566.86. For the $86,658.13 balance, the shareholders issued to the corporation 20-year non-interest bearing notes in the face amount of $86,658.13. On January 31, 1941, and monthly thereafter, payments on these notes were made to the corporation by the shareholders. By December 31, 1944, over one-half of the face amount of the notes had been paid. Aside from asking that payment by these 20-year notes be completely disregarded, which we can not do, respondent has not asserted that the value of the notes was less than $86,658.13 of corporate property for which they had been given. The notes were non-interest bearing 20-year notes. Plainly their discounted value in 1940 was less than their face value of $86,658.13. Commissioner v. Kellogg, 119 Fed. (2d) 115. In fact, petitioners on brief just about concede this, for they admit that the shareholders received a benefit from the corporation to the extent that interest was not payable on the unpaid balance of their notes. This difference between the $86,658.13 of net corporate assets received by the shareholders and the discounted value of the 20-year *120 notes given by them to the corporation was in effect a distribution of corporate earnings and taxable as a dividend. J. E. Timberlake, supra. No effort was made by either party to arrive at the discounted value in 1940 of these 20-year non-interest bearing notes. Again the parties may be able to agree on this discounted value under Rule 50 computation. If not, evidence must be offered at a further hearing. Commissioner v. Kellogg, supra. It is held that the difference between the $133,224.99 of net assets turned over to the shareholders and the amount received by the corporation from them, consisting of the discounted value of the shareholders' 20-year non-interest bearing notes plus the amount of cancelled corporate notes which had otherwise been includible in gross income for Boyd and Allen, constituted taxable income to the shareholders in 1940. The next question presented is whether Boyd and Allen alone, and not Allen's wife, constituted the corporate shareholders to whom the income described above was taxable. Our findings reveal that Mrs. Allen was not a shareholder of the corporation, and that Allen actually owned all the corporate stock except that owned *121 by Boyd. The authorized capital stock of the corporation was 1,000 shares, all of which were originally owned by Allen. In 1921 Allen sold Boyd 333 shares. The corporation issued a certificate for the 333 shares to Boyd, and a certificate to Allen for 666 shares. A certificate for the remaining one share was issued in the name of Mrs. Allen as a qualifying share. It is true that there is some evidence in the record which might be seized upon to point to Mrs. Allen as the owner in 1940 of more than one-half of the corporate stock. In 1922 Allen executed a stock assignment form which recited that he transferred to Mrs. Allen his 666 shares. He delivered the stock certificate and attached assignment form to Mrs. Allen. In 1934, at a meeting of the corporate directors and stockholders to extend the corporate term, the minutes speak of Mrs. Allen as the owner of 666 shares and Allen as the owner of only one share. The articles of incorporation filed in 1934 with the Michigan Secretary of State to extend the corporate term likewise list Mrs. Allen as the owner of 666 shares of the corporate stock. In 1936 when Boyd desired additional shares of the corporation, he and Mrs. Allen signed *122 the purchase and sale agreement for the 177 shares. Moreover, he endorsed his weekly and semi-monthly checks in periodic payment of these shares to the order of Mrs. Allen. Finally, Mrs. Allen reported in her income tax return for 1939 $666 of dividend income, representing the $1 a share dividend declared by the corporation. On the other hand, the evidence is much stronger and more persuasive that Allen did not intend to, nor did he make, a valid gift of the 666 corporate shares to Mrs. Allen. The ownership of the 666 shares was never transferred on the books of the corporation from Allen's name into Mrs. Allen's name. The transfer of certificates upon the corporation books may not be essential to the validity of the gift, Dulin v. Commissioner, 70 Fed. (2d) 828, but it is perhaps the best indication of an intention to transfer title. Marshall v. Commissioner, 57 Fed. (2d) 633; Dulin v. Commissioner, supra, at p. 831. Allen did not endorse the back of the certificate although a space was provided thereon for purposes of transferring ownership of the shares. Instead he executed a separate stock assignment form which he attached to the certificate *123 by a removable clip. Although he gave the certificate and assignment to his wife, several months later he placed them in his lock box in the company safe to which he of course had access. They have remained there. Exclusive control and dominion over the property really was not surrendered to Mrs. Allen. Marshall v. Commissioner, supra.
The corporation filed yearly corporate income tax returns. Although the alleged gift took place in 1922, in the return filed for that year and for each year up to and including 1935, Allen was designated as a compensated officer of the corporation owning 666 shares. It was not until 1936 that he was listed in the returns as owning only one share. Boyd allegedly purchased the 177 shares in 1936 from Mrs. Allen for approximately $33,000. Yet Allen handled all the details with respect to this sale. Mrs. Allen never actually received any money from the sale. Boyd may have endorsed his salary checks over to Mrs. Allen in periodic payment for the shares. However, he gave the checks, not to Mrs. Allen, but to Allen. Allen endorsed the checks as attorney in fact for Mrs. Allen. But he deposited them in his own personal bank account. Payment of about $30,000 *124 to Mrs. Allen was allegedly made on December 31, 1944. It consisted of Allen's crediting this sum, which he listed on his books as received from Boyd and owing to Mrs. Allen, to the payment of two promissory notes which Mrs. Allen had given him in 1940. At the time Allen credited the $30,000 to the payment of Mrs. Allen's notes to him, Boyd's records revealed that he had only paid about $26,000 on the purchase price of the shares. The dividend transactions in 1936 and 1939 likewise show that Mrs. Allen really owned none of the corporation's stock. The corporation never declared any cash dividends. On December 29, 1936, the board of directors declared a dividend of $6 per share, to be paid in promissory notes of the corporation payable five years thereafter. The corporation was a close corporation. Everyone knew who the shareholders were. Yet the corporation only issued two notes, one to Allen and the other to Boyd. The note payable to Allen was in the amount of $4,002. This represented the $6 dividend, not on the one share which petitioners claim he then owned, and not on the 666 shares of which he was the stockholder of record, but on the full 667 shares which he actually owned. *125 To exalt artifice, Allen, after receiving the five-year note for $4,002 from the corporation, gave Mrs. Allen his own promissory note payable 10 years thereafter in the amount of $3,996. The 1939 dividend transaction took this same form, with the exception that after Allen received from the corporation a demand note for $667, representing a dividend of $1 a share, he gave Mrs. Allen his note for $666, but payable 10 years thereafter. Another very convincing aspect of the evidence that Allen, and not Mrs. Allen, owned the shares of the corporation lies in a provision of the partnership agreement entered into by Boyd, Allen, and Mrs. Allen on December 21, 1940. The purchase of the 177 corporate shares gave Boyd, after the shares were paid for, ownership of 510 of the 1,000 outstanding shares. The parties contemplated that their interests in the partnership were to be the same as their interests in the corporation. Accordingly, Boyd was listed in the partnership agreement as contributing 51 percent of the capital of the partnership, and Allen and Mrs. Allen the remaining 49 percent. Of this 49 percent, Mrs. Allen's interest was specified to be 48 percent, and Allen's interest one *126 percent. The agreement recited that in the event Allen died before Mrs. Allen, or Boyd died before Mrs. Boyd, the partnership was to pay each month for a period of three years to Mrs. Allen or Mrs. Boyd, a sum equal to one-third of the amount which Allen or Boyd had been allowed to withdraw from the partnership in the calendar month preceding his death. It was further provided that the amounts to be paid to Mrs. Boyd were to be charged to Boyd's capital account. However, the amounts to be paid to Mrs. Allen, in the event Allen predeceased her, were to be charged to her own and not to Allen's capital account. Plainly it was contemplated that Mrs. Boyd and Mrs. Allen were to be treated exactly alike in the event that either of them survived her respective husband. For three years they were to get one-third of the amount ordinarily withdrawn by their husbands. To Mrs. Boyd this is in the nature of a bequest. But if the language couching Mrs. Allen's payment is to be taken at its face value, what she gets is nothing more than permission to make withdrawals from her own capital account. However, if the capital account standing in her name is in reality Allen's, she will be treated, *127 as it was understood, in the same manner as Mrs. Boyd. Since the parties contemplated that their capital interests in the partnership were to be the same as their shareholders in the corporation, it is evident that Allen, and not Mrs. Allen was the actual owner of all the shares of the corporation other than those owned by Boyd. Mrs. Allen never performed any work for the corporation. She was completely unfamiliar with the business. Although she is said to have been a director and the principal stockholder, she attended no meetings of the corporate directors or stockholders with the exception of two meetings held in 1936 and 1939 for the purpose of declaring the note dividends. The corporation built up a surplus in accumulated earnings and profits of approximately $91,000. Yet it never declared any cash dividends. Mrs Allen never received any money from the corporation as a result of her alleged stockholdings or otherwise. In Howard B. Lawton, supra, we held on facts essentially similar to those involved here, that a husband had not made valid, completed gifts of stock to his wife and children. Accordingly, the husband alone was held to be the owner of the bulk of *128 the corporate shares and subject to the tax on the liquidation of the corporation. It follows that any income derived on the transfer of the corporate assets in 1940 must be taxable to Boyd and Allen alone, and not to Mrs. Allen. It is true that one share originally was issued in Mrs. Allen's name in 1922, but this admittedly was a mere qualifying share over which there is no evidence that she exercised any dominion and control. Allen likewise must be considered the owner of this share for tax purposes. Howard B. Lawton, supra, at page 1101. Little needs to be said on whether Mrs. Allen could be recognized for income tax purposes as being engaged in business in 1941 as a partner with Boyd and Allen. On December 21, 1940, Allen, Mrs. Allen, and Boyd signed a partnership agreement which recited that the parties agreed to engage in the business of manufacturing and selling chemical products. It was also provided in the agreement that the capital to be invested by the parties was to consist of all the assets, except land and buildings, of the Mark W. Allen & Company, which the corporation was about to sell to the partnership. The partners' interests in the partnership *129 were listed as one percent for Allen, 51 percent for Boyd and 48 percent for Mrs. Allen. The agreement provided further that the first $36,000 of profits, or losses, were to be divided equally between Allen and Boyd, and the balance divided among the three partners in accordance with their respective interests. A supplement to the purchase and sale agreement for the 177 shares entered into by Mrs. Allen and Boyd recited that Boyd's 51 percent interest in the partnership was to be adjusted downward in accordance with the unpaid balance remaining on the purchase price of the 177 shares. The parties agreed also to give such time and service to the business as they would mutually agree upon. Since January 1, 1941, the partnership has carried on the manufacture of soap, beauty and toilet preparations in exactly the same manner as the corporation. During 1941, Boyd and Allen devoted full time to the business. Mrs. Allen never performed any services for the partnership. She never contributed to the partnership's management or control. She was completely unfamiliar with the business. All this petitioners readily admit. They claim, however, that she, together with Boyd and Allen, had *130 a capital interest in the partnership, and that the profits over the first $36,000 rightfully should be allocated in accordance therewith. This contention must be rejected. Plainly, Mrs. Allen contributed no capital originating with her. Commissioner v. Tower, 327 U.S. 280. Her share of the net assets of the corporation which she allegedly purchased and turned over to the partnership was valued at $63,948. For this $63,948 of net assets, she gave to the corporation her 20-year non-interest bearing note in the amount of $33,491.50. The corporation owed Allen $30,506.50 in the form of notes payable for salary and dividends. Allen cancelled this $30,506.50 of notes payable to him, which, together with Mrs. Allen's note to the corporation for $33,441.50, made the $63,948 due the corporation. Mrs. Allen then gave Allen two 20-year non-interest bearing notes in the respective amounts of $25,237.20 and $5,269.30 in payment of the $30,506.50 of corporate notes cancelled by Allen. Hence, at the outset Mrs. Allen's alleged capital contribution consisted of a note to the corporation and two notes to her husband. On January 31, 1941, and monthly thereafter, payments were made *131 by partnership check to the corporation on Mrs. Allen's note. During 1941 about $240 a month was allocated by the partnership to the payment of Mrs. Allen's note. Boyd and Allen withdrew about $20,000 and $12,500, respectively, from the partnership in 1941. Mrs. Allen made no withdrawals. Her capital account in 1941 was charged only with $3,076, all of which was paid by the partnership to the corporation on her note. We have already held that Allen, and not Mrs. Allen, actually owned the 177 corporate shares sold to Boyd. The payments on these shares which Allen on December 31, 1944, credited to the two notes which Mrs. Allen gave him at the time of the formation of the partnership plainly did not constitute a contribution of any of her own capital. Mrs. Allen thus contributed to the partnership no capital originating with her. In essence her contribution is claimed to have consisted of her alleged share in the corporate assets as represented by the stock purportedly given to her. See Howard B. Lawton supra, at page 1103. We have held that she owned none of the corporate stock and had no interest in the assets transferred to the partnership. *132 Her notes to the corporation and her husband did not in any way augment the capital of the partnership. The assets used by the corporation, in which she had no interest, were available to the partnership regardless of her participation. See Lowry v. Commissioner, 154 Fed. (2d) 448; affirming 3 T.C. 730. Her admission into the partnership thus was a mere paper reallocation of income between her and her husband, ineffective to relieve Allen from the tax as the person who earned or created the income. Commissioner v. Tower, supra; Paul G. Greene, 7 T.C. No. 19. The last question presented relates to the amount of income realized by the partnership in 1941. Immediately prior to the transfer of the corporate assets to Boyd, Allen and Mrs. Allen, who in turn transferred the assets to the partnership, the books of the corporation reflected accounts receivable in the face amount of $71,401.65. The corporate books also reflected a provision for losses in the amount of $7,619.76 or a net value of $63,781.89 for the accounts receivable. In valuing the net assets transferred by the corporation at $133,224.99, accounts receivable were valued *133 at the net amount of $63,781.89. The partners and the partnership acquired the accounts receivable in the first instance for $63,781.89. During 1941, the face value of $71,401.65 was collected by the partnership on the accounts receivable. The partnership return of income for 1941 revealed net income in the amount of $50,551.39. By letter dated February 25, 1944, the Bureau of Internal Revenue proposed an adjustment to reflect an additional $7,619.76 of income realized by the partnership on the collection of accounts receivable at the face value of $71,401.65 as against a basis of $63,781.89. As of December 31, 1944, the partnership adjusted its accounts with the corporation to take care of this $7,619.76 by adding to the unpaid balance on the 20-year notes payable to the corporation by Boyd Allen and Mrs. Allen, the separate sums of $3,886.08, $76.20, and $3,657.48, respectively; total $7,619.76. No new notes, however, were issued. The parties are in agreement that the basis of the accounts receivable in the hands of the partnership was the cost of the accounts receivable to the partners, adjusted for any gain or loss realized by the partners on the purchase from the corporation. *134 Section 113 (a) (13) of the Internal Revenue Code. Since it is stipulated that the accounts receivable were valued at the time of the purchase in the amount of $63,781.89, respondent has ascribed this amount as their basis. Petitioners' sole argument against the use of this basis is that the partnership should have paid to the corporation in 1940, but did not pay until December 31, 1944, the full face value, $71,401.65, of the accounts receivable. They claim that the provision for losses shown on the books of the corporation in the amount of $7,619.76 was a surplus reserve and not a reserve for bad debts. They assert, therefore, that the corporation had never charged this $7,619.76 to bad debts deductible for tax purposes. We fail to see the significance of petitioners' argument. Whether or not the reserve on the books of the corporation was a reserve for bad debts or surplus reserve, it is undenied that the partnership through the partners paid the corporation $7,619.76 less for the accounts receivable than the amount which it collected. The corporation could have sold the accounts receivable to the partners at any discount from face value which it chose. It *135 did not have to set up on its books any reserve item for such sales price. But if it is deemed important that the provision for losses was a surplus reserve, as petitioners claim, we observe that in the income tax returns filed by the corporation for the four years preceding the transfer, no surplus reserve was ever listed in the balance sheet incorporated therein. In fact, in the return filed for 1939, the $7,619.76 is listed as a reserve for bad debts offsetting accounts receivable. The subsequent adjustment of the purchase price by increasing the balance due on the notes owing to the corporation four years after the transfer, when the matter was already in controversy before the Commissioner, was plainly an afterthought and can not affect the true basis of the accounts receivable. Respondent's determination with respect to this item of $7,619.76 is sustained. Decision will be entered under Rule 50. Footnotes
*. A memorandum opinion, although not a 1946 decision, supplementing the findings of fact and opinion of this decision, appears at page 1205 herein for reference purposes. - CCH.↩
1. REGULATIONS 103. SEC. 19.22(a)-1. What included in gross income. * * * If property is transferred by a corporation to a shareholder * * * for an amount substantially less than its fair market value, regardless of whether the transfer is in the guise of a sale or exchange, such shareholder * * * shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of * * * a distribution of earnings or profits taxable as a dividend, * * *.↩